ROBBINS LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsllp.com
CRAIG W. SMITH (164886)
csmith@robbinsllp.com
SHANE P. SANDERS (237146)
ssanders@robbinsllp.com
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

[Additional Counsel on Signature Page]

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| TIMOTHY JACKSON, Derivatively on Behalf of GROCERY OUTLET HOLDING CORP., <br><br> Plaintiff, <br><br> v. <br><br> ERIC J. LINDBERG, JR., ERIK D. RAGATZ, JASON POTTER, KENNETH W. ALTERMAN, JOHN E. BACHMAN, MARY KAY HABEN, THOMAS F. HERMAN, CAREY F. JAROS, GAIL MOODY-BYRD, JEFFREY R. YORK, ROBERT J. SHEEDY, JR., and CHARLES C. BRACHER, <br><br> Defendants, <br><br> -and- <br><br> GROCERY OUTLET HOLDING CORP., a Delaware Corporation, <br><br> Nominal Defendant. | Case No. <br><br> VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, AND UNJUST ENRICHMENT <br><br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

Plaintiff Timothy Jackson ("Plaintiff"), by his attorneys, derivatively on behalf of nominal defendant Grocery Outlet Holding Corp. ("Grocery Outlet" or the "Company"), submits this Verified Stockholder Derivative Complaint against defendants Eric J. Lindberg, Jr., Erik D. Ragatz, Jason Potter, Kenneth W. Alterman, John E. Bachman, May Kay Haben, Thomas F. Herman, Carey F. Jaros, Gail Moody-Byrd, Jeffrey R. York, Robert J. Sheedy, Jr., and Charles C. Bracher (collectively, the "Individual Defendants") for their breaches of fiduciary duties as directors and/or officers of Grocery Outlet, unjust enrichment, and violations of sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.  This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant Grocery Outlet against certain of its current and/or former officers and directors.  This action seeks to hold the Individual Defendants responsible for their knowing and reckless failure to abide by and act in accordance with their fiduciary duties.  The allegations below are taken from federal, state, and local government records, law and safety enforcement, regulatory bodies, agencies, public investigative reports, planning and assessment documents, media accounts, and reports.

2.     Headquartered in California, Grocery Outlet is a discount supermarket chain that sells groceries at significantly lower prices than traditional retailers.  The Company achieves these savings by purchasing surplus inventory, closeout items, and products with packaging changes from manufacturers, then passing the savings on to customers.  Due to this purchasing model, its product selection changes frequently, creating a "treasure hunt" shopping experience with brand-name and private-label goods, including fresh produce, meat, dairy, and household items.

3.     In 2023, the Company disclosed its plans to upgrade and transition its internal systems (the "Systems Transition").  Grocery Outlet touted its Systems Transition as a modernization of its digital infrastructure, claiming it would enhance the Company's inventory management, financial tracking, and

operational efficiency.  As part of the upgrade, Grocery Outlet promoted a new "store portal" that it claimed would deliver improved purchasing, merchandising, and marketing insights.  The Individual Defendants assured the public that the Company could implement these changes in an efficient and in a timely manner.  However, Grocery Outlet lacked the capabilities to implement the Systems Transition effectively, resulting in delays and challenges that materially impacted its profitability.

4.      Instead of promptly disclosing this material information to its investors, Grocery Outlet continued to downplay its issues, keeping its stock artificially inflated.  Between October 2023 and October 2024, despite knowledge of the Company's challenges, Grocery Outlet's fiduciaries caused the Company to spend nearly $84 million to repurchase over 4.1 million shares of Company common stock at inflated prices.  By contrast, from November 2021 through September 2023, the Company had repurchased only $6.7 million worth of Company common stock.

5.      Further, due to their positions within Grocery Outlet, certain officers and directors had insider knowledge regarding the Company's issues.  Exploiting the artificial inflation of Grocery Outlet's stock prices caused by the unlawful activity detailed herein, these individuals sold nearly $40 million worth of their personally held Company stock at inflated prices.

6.      On May 7, 2024, Grocery Outlet began to reveal the truth in its press release, reporting disappointing first quarter 2024 results.  The press release also announced the Company lowered its full year guidance, citing significant transition issues.  Following the press release, Grocery Outlet's stock plummeted over 19.3%, or $5.02 per share, on May 8, 2024, to close at $20.88 per share compared to the previous trading day's closing of $25.90 per share, erasing over $501.3 million in market capitalization.

7.      Finally, on October 30, 2024, Grocery Outlet announced that defendant Robert Joseph Sheedy, Jr. ("Sheedy") had stepped down as the Company's President and Chief Executive Officer ("CEO") and resigned from the Board of Directors (the "Board"), effective immediately.

8.      In the wake of the disclosure, the Company's share price plunged over 16.3%, or $2.71 per share, on October 30, 2024, to close at $13.90 per share compared to the previous trading day's closing of $16.61 per share, erasing another $263.2 million in market capitalization.

9.      The Individual Defendants repeatedly issued misleading public statements concerning challenges and setbacks resulting from Grocery Outlet's implementation process, which have devastated

the Company's credibility. As a result, the Company's market capitalization has fallen $2 billion, or 60.4%.

10. Further, as a direct result of this unlawful course of conduct, Grocery Outlet is now the subject of two federal securities class actions filed in this district on behalf of investors who purchased the Company's shares at inflated prices, titled *Cavanaugh v. Grocery Outlet Holding Corp., et al.*, Case No. 3:25-cv-02886-JD and *Liberato v. Grocery Outlet Holding Corp., et al.*, Case No. 4:25-cv-00957-JST (the "Securities Class Actions"). Accordingly, Grocery Outlet will continue to suffer harm by bearing the costs of defending against, and resolving through settlement or judgement, these Securities Class Actions.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because Plaintiff's claims raise a federal question under section 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a) and 78t-1), and section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R §240.10b-5) promulgated thereunder by the SEC. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

12. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

13. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in this District because the Individual Defendants have been involved in business in this District. The Individual Defendants' actions have had an effect in this District. Further, the Company is headquartered in this District.

## DIVISIONAL ASSIGNMENT

A substantial portion of the transactions and wrongdoings which give rise to the claims in this action occurred in the County of Alameda and therefore, this action is properly assigned to the Oakland Division.

# THE PARTIES

**Plaintiff**

15.    Plaintiff Timothy Jackson was a stockholder of Grocery Outlet at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Grocery Outlet stockholder.

**Nominal Defendant**

16.    Nominal defendant Grocery Outlet operates a chain of over 470 discount supermarkets across the United States, focusing on delivering groceries at discount prices to traditional grocery stores. Its business model centers on opportunistic purchasing, acquiring excess inventory, seasonal overstocks, closeout items, and products with packaging changes directly from manufacturers at steep discounts.  This allows the Company to offer a mix of name-brand and private-label products—including fresh produce, meat, dairy, frozen foods, household goods, and alcohol—in a "treasure hunt" shopping format where inventory varies weekly.

17.    Stores are typically run by independent operators, local entrepreneurs who manage day-to-day operations under Grocery Outlet's brand, sharing profits while benefiting from a centralized supply chain and marketing support.  This model fosters community ties and operational flexibility.  The Company generates revenue through sales across its stores, with a lean cost structure that prioritizes value-driven offerings over premium services such as extensive deli counters or in-store dining.

18.    Headquartered in Emeryville, California, Grocery Outlet has expanded steadily, growing from a family-owned business founded in 1946 to a publicly traded company (NASDAQ: GO) since its 2019 initial public offering.

19.    Grocery Outlet competes in the discount retail space, competing with chains such as Aldi and Dollar General, with a focus on affordability and accessibility, particularly in underserved markets. In fiscal 2023, the Company reported $4 billion in net sales.

**Defendants**

20.    Defendant Eric J. Lindberg, Jr ("Lindberg") has served as a director of Grocery Outlet since January 2006.  Defendant Lindberg was also Grocery Outlet's Interim President and CEO from October 2024 to February 2025; Chairman of the Board since January 2023; CEO from January 2019 through

December 2022; and Co-CEO from January 2006 to December 2018. Prior to being appointed Co-CEO, defendant Lindberg served in various positions with the Company since 1996. The Company paid defendant Lindberg compensation of $388,027 and $4,762,087 in 2023 and 2024, respectively. During the relevant period, defendant Lindberg sold 1,510,179 shares of his personally held Grocery Outlet stock based on material nonpublic information, reaping proceeds of approximately $38,796,222.01.

21.    Defendant Erik D. Ragatz ("Ragatz") has served as the Company's Lead Independent Director since January 2023, as a director since October 2014, and as Chairman of the Board from October 2014 to December 2022. Defendant Ragatz has also served as a Senior Advisor at Hellman & Friedman LLC ("H&F"), a private equity firm, since February 2023, and previously served as a Partner of H&F from 2008 through early 2023. In 2014, H&F acquired Grocery Outlet from Berkshire Partners LLC, acquiring approximately 80% of the Company while management and the founding family retained about 20%. After Grocery Outlet went public in June 2019, H&F gradually reduced its stake, selling its remaining 9.6 million shares (about 11% of total shares) in May 2020, thereby completing its exit. Defendant Ragatz, however, remains on the Board and continues to serve on several boards and board committees of private H&F portfolio companies. Defendant Ragatz serves as Chairman of the Board of Directors of At Home Group, Inc.; Chairman and member of the Board of Directors of The New Leaf Company BV (d/b/a Superplum); and member of the Board of Directors of And Go Concepts, LLC (d/b/a Salad&GO). The Company paid defendant Ragatz compensation of $309,249 and $295,006 in 2023 and 2024, respectively.

22.    Defendant Jason Potter ("Potter") is a director of Grocery Outlet and has served as the Company's President and CEO since February 2025.

23.    Defendant Kenneth W. Alterman ("Alterman") has served as a director of Grocery Outlet since February 2011. The Company paid defendant Alterman compensation of $258,027 and $247,876 in 2023 and 2024, respectively.

24.    Defendant John E. Bachman ("Bachman") has served as a director of Grocery Outlet since November 2019. Defendant Bachman also serves as Chair of Grocery Outlet's Audit and Risk Committee. The Company paid defendant Bachman compensation of $263,027 and $250,006 in 2023 and 2024, respectively.

25.     Defendant Mary Kay Haben ("Haben") has served as a director of Grocery Outlet since November 2019.  The Company paid defendant Haben compensation of $256,805 and $245,006 in 2023 and 2024, respectively.

26.     Defendant Thomas F. Herman ("Herman") has served as a director of Grocery Outlet since 2004.  Defendant Herman also serves as a member of Grocery Outlet's Audit and Risk Committee.  The Company paid defendant Herman compensation of $263,027 and $250,006 in 2023 and 2024, respectively.  During the relevant period, defendant Herman sold approximately 13,000 shares of his personally held Grocery Outlet stock based on material nonpublic information, reaping proceeds of approximately $385,700.

27.     Defendant Carey F. Jaros ("Jaros") has served as a director of Grocery Outlet since September 2020.  The Company paid defendant Jaros compensation of $248,027 and $235,006 in 2023 and 2024, respectively.

28.     Defendant Gail Moody-Byrd ("Moody-Byrd") has served as a director of Grocery Outlet since January 2021.  Defendant Moody-Byrd also serves as a member of Grocery Outlet's Audit and Risk Committee.  The Company paid defendant Moody-Byrd compensation of $253,027 and $240,006 in 2023 and 2024, respectively.

29.     Defendant Jeffrey R. York ("York") has served as a director of Grocery Outlet since November 2010.  Defendant York also serves as a member of Grocery Outlet's Audit and Risk Committee.  The Company paid defendant York compensation of $253,027 of $240,006 in 2023 and 2024, respectively.

30.     Defendant Sheedy served as the Company's CEO and as a director from January 2023 to October 2024; President from January 2019 to December 2022; Chief Merchandise, Marketing & Strategy Officer from April 2017 to December 2018; Chief Merchandise & Strategy Officer from March 2014 to April 2017; and Vice President, Strategy from April 2012 to February 2014.  The Company paid defendant Sheedy compensation of  $6,239,771 and $9,478,398 in 2023 and 2024, respectively.

31.     Defendant Charles C. Bracher ("Bracher") served as the Company's Executive Vice President and Chief Financial Officer from April 2012 to March 1, 2024.  The Company paid defendant Bracher compensation of $2,215,811 and $167,771 in 2023 and 2024, respectively.

32.     Defendants Lindberg and Herman are collectively referred to herein as the "Insider Selling Defendants."

33.     Defendants Lindberg, Ragatz, Potter, Alterman, Bachman, Haben, Herman, Jaros, Moody-Byrd, and York are collectively referred to herein as the "Current Director Defendants."

34.     Defendants Bachman, Herman, Moody-Byrd, and York are collectively referred to herein as the "Audit Committee Defendants."

**SUBSTANTIVE ALLEGATIONS**

35.     Grocery Outlet's fiduciaries issued false statements about Grocery Outlet's 2024 profitability and its ability to execute a major internal systems upgrade.  They portrayed the transition as on track and low-risk, thereby boosting investor confidence.  However, they concealed significant issues—delays, implementation issues, and cost overruns—that threatened profitability.  The truth was not revealed until October 29, 2024, when Grocery Outlet reported that defendant Sheedy would step down from his positions as President, CEO, and as a director.  The Company identified ongoing implementation issues as a contributing factor in his resignation.  The following day, Grocery Outlet's stock cratered 16.3%.

36.     In mid-2023, Grocery Outlet undertook major systems upgrades, including changes to its product inventory and financial and reporting platforms.  However, the Company was ill-equipped to execute the Systems Transition in a timely and effective manner and failed to disclose the substantial risks to its profitability arising from delays and implementation issues.

37.     Rather than alerting investors that Grocery Outlet struggled with its Systems Transition and that these issues would significantly impact the Company's profitability—the Individual Defendants issued a series of false and misleading statements, misrepresenting that the Company remained on track with its transition.

**FALSE AND MISLEADING STATEMENTS**

38.     Between August 8, 2023 and February 28, 2024, the Individual Defendants made a series of materially false and misleading statements concerning Grocery Outlet's ability to effectively implement its Systems Transition.

39.      In particular, on August 8, 2023, the Company held its earnings call with analysts and investors to discuss its financial results for the second quarter ended July 1, 2023.  During the call, defendant Sheedy discussed the Company's Systems Transition, including a new store portal, which he framed as the central access point of the Company's website.  Defendant Sheedy described the upgrade as follows:

> [Our forthcoming store portal is] a new platform that will provide operators with better analytics and easier access to information to make smarter business decisions. We look forward to delivering this new application to operators this quarter.

40.      During the call, defendant Sheedy touted the many purported benefits of the new portal and other system enhancements, stating:

> **Analyst:** [...] [W]hen is the portal going to be out there? And what do you think-if you had to pick 2 elements of that, that will be the most impactful for the IOs. What would that be? I'm sort of curious in terms of so many items, elasticity. Is that one of the that would allow the IOs to price more opportunistic if they haven't to date?
>
> **Defendant Sheedy:** Yes. We're really excited about the portal, together with some other system enhancements that we will be implementing this quarter. So it's here being implemented very soon. And then yes, in terms of benefits for the operator, gosh, so many. I think, John, the first thing that comes to mind is just easier access to information and access to new information that they've not seen before, at least not in the format that it will be available. And then with that, comes better decision-making, faster, better decision-making around inventory, around ordering, around managing the mix, really in all aspects for how they manage their business, which is a huge benefit, so which to grow sales and improve margin. And then the other benefit that I would mention is just efficiencies. So certainly, you've talked about rise in costs, operating expenses, labor, et cetera, challenges that we, together with operators, have managed through for a long time now, but this new platform portal will allow them to operate even more efficiently, better use of their time, reallocate it to spend time with customers, or operate the P&L more efficiently to help them with their income growth.

41.      Defendant Sheedy's statements were materially false and misleading because he overstated the likelihood of the new portal's success.  In reality, Grocery Outlet was unprepared to implement its Systems Transition and lacked the qualified personnel necessary to manage it effectively.

42.      On November 7, 2023, Grocery Outlet held an earnings call with analysts and investors to discuss its financial results for the third quarter ended September 30, 2023.  During the call, defendant Sheedy admitted the Systems Transition had caused some "disruptions," but assured investors that the

"transaction impact [will] be largely behind us by the end of the year."  In particular, defendant Sheedy stated:

> While pleased with our third quarter performance, **we experienced operational disruptions as we transition to upgraded systems.** On prior calls, we have discussed our approach and history of investing in modernizing systems to improve capabilities and drive efficiency. **We began to implement our most recent enhancements in late August, which include upgrades to product, inventory, financial and reporting platforms.** One important component of this upgrade is a new store portal that will provide operators with improved data to make better purchasing, merchandising and marketing decisions. We are excited for the improved functionality, scalability and data analytics that this and other enhancements will provide. **The transition to these new systems has resulted in ordering and inventory disruptions that have impacted third and fourth quarter results.**
>
> **We have been partnering closely with our independent operators to minimize the impact to customers and sales. We have also elected to provide commission support to our operators as we continue to make steady progress adapting to the new systems. We anticipate the transitional impact to be largely behind us by the end of the year.** Charles will provide more details in his commentary.

43.    During the question-and-answer portion of the call, defendants Sheedy and Bracher discussed the duration and materiality of the Systems Transition's financial impact.  Defendants Sheedy and Bracher claimed that the inventory management issues responsible for the most significant disruptions had been resolved, and reaffirmed that the Systems Transition issues would be behind Grocery Outlet in the new year:

> **Analyst:** I just wanted to start off with a couple of questions around the new platforms you implemented this quarter. What has been the biggest challenge related to the ordering? Is it just learning the new program? Is there anything specific about the functionality that surprised you?
>
> **And then you also said the disruption would be largely behind us by year-end. But how should we think about any impact into the first half of next year, especially any cost that we should think about annualizing?** And then also, you mentioned that would bring better data analytics. Just curious, how quickly you think you can implement those learnings? Or have you any insights to share in just the first few months?
>
> **Defendant Sheedy:** Leah, I'll take the first couple of parts of that question, and then I'll turn it over to Charles to address your question around impact into 2024. First, just some more information on what I shared in my comments. **We did upgrade a number of systems at the end of August, inclusive of product inventory, financial and reporting platforms. These upgrades include replacement of our AS400 system, which is our legacy ERP system with SAP, along with other third-party plus some new**

***proprietary applications for buying, in-store operations. So that was the enhancement that was implemented back a couple of months ago.***

\*    \*    \*

***In terms of the challenges and the disruption that we face as we transition to the new systems, we were challenged with inventory visibility, and the impact here was on ordering and inventory management in general.*** And unfortunately, this disruption did have an impact throughout the business and the P&L. And notably, as mentioned in our comments, top line sales were impacted by lighter inventory levels, slightly lower variety. We had some pressure on margin as it relates to inventory inefficiencies. And then SG&A was higher as well as we elected to provide operators with support.

***I'll say that we did expect some disruption during this transition. It was factored into previous guidance, just not to the degree that we've been experiencing it. And of course, we're very disappointed with the magnitude of it and we own it. We own where we are. And at this point, we have addressed the inventory visibility issues, along with other issues we experienced earlier on. So we've made very good progress there.*** We've also recently returned to more normalized store ordering practices. We have much healthier warehouse inventory levels and flow throughout the system. So we're feeling good about all of that.

I'll also say that we are still adapting to other parts of the new systems. We were working through some of these new processes and working our way back to what I would describe as more optimal inventory levels and margin management and therefore, the impact that we anticipate throughout the fourth quarter here. ***Nevertheless, we are making good daily progress. And as I mentioned, we do anticipate the transitional impacts to be largely behind us as we get to the end of the year.*** And I'll kick it over to Charles now to comment on 2024.

**Defendant Bracher:** Yes. Leah, this is Charles. Just a bit more color on cost and sort of the cadence as you think about the quarterly impact going into next year. So as it relates to the third quarter, again, think of this as being 1 month of impact to the fiscal quarter. ***And so as RJ mentioned, we felt both the top line and a margin impact in Q3, along with elective commission support. You see the same impacts in the fourth quarter, just to a greater degree as we're feeling the kind of full 3-month impact,*** *if you will, in the fourth quarter.*

***We do expect that as we -- over the course of the fourth quarter, all of those impacts moderate. And as disappointed as we are with the magnitude of the impact in the fourth quarter, we do expect and believe that it will be largely behind us by the end of the year.*** And so our view at this point is we will enter the new year without any lingering cost impacts or otherwise related to the transition.

\*    \*    \*

**Analyst:** Charles, regarding your comp guidance, is your expectation that traffic continues to be very positive, offset by average unit retail? What should we think about in terms of average unit retails near and longer term? And as we appreciate a lot of the good changes on the new store portal. ***The***

- 10 -
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

*issues you had, just what gives you confidence that they'll be largely behind by end of year?*

\*    \*    \*

**Defendant Bracher:** As it relates to the comp headwind as a result of the systems transition, that really did impact ticket. So [Ring], as you saw, was down a little less than 2% for the quarter, really coming from lower units. And that's both as a result of higher trip frequency. But yes, lighter inventory levels and variety is a result of the system transition.

\*    \*    \*

**Defendant Sheedy:** And on the -- your question around the systems upgrades, Oliver, as I mentioned before, *we have addressed the bigger issues that we faced earlier on around inventory issue -- around inventory visibility issues as well as product flow challenges, both into the warehouse and also from the warehouse to the stores.* So that progress feels really good. And as a result, we have returned to more, I'll call them, more normalized store ordering practices. And then together with that, healthier warehouse and store inventory levels at a really important time. So feeling good about the progress that we've made in support of the holiday shopping period that we're in the middle of right now.

We are still adapting to other parts of the new systems. There are a lot of new processes, new functionality that comes with these new systems. And then together with that, working our way back to what we would consider to be optimized inventory levels along with how we manage the business and total margin and operations included. *Given the progress that we've made and the daily progress that we continue to make, we do feel confident in being able to resolve these outstanding issues to the point where the impact is then largely behind us by the end of the year.*

\*    \*    \*

**Analyst:** So RJ, I just wanted to follow up on the system upgrades. I mean, it does sound like you anticipated some disruption but then it has actually come in well ahead of that. Like, one, is that a fair characterization? And then two, is it fair to say that this doesn't alter any of the margin structure into next year or the long term? And you'll essentially be able to fully recapture all of the margin pressures once you lap the third and the fourth quarters?

**Defendant Sheedy:** The -- yes, for your first question, that is a fair characterization. We did expect -- this is a big transition from a legacy platform that we've been operating on for the past several decades. So -- and it's something that we've been working on for a couple of years now. *So we've always known how large it was and complex. We did expect as a result, some disruption, certainly not to this degree or this magnitude.* So I think you characterized it well.

And then in terms of impact looking forward, and I think similar to the earlier question, we -- as I said, *we do the transitional impact to be contained to this year, from what we've already experienced in the third quarter. And then largely behind us at the end of the year.* So you should think about us reverting back to previous performance and all the things that

1    we've always talked about related to consumer trends, top line sales and how we've managed for both gross margin and bottom-line profit.

2    44.    On February 27, 2024, the Company held an earnings call with analysts and investors to

3    discuss its fourth quarter and full year 2023 financial results.   During the call, defendant Sheedy,

4    contradicting previous statements, admitted that the Systems Transition would continue to harm Grocery

5    Outlet financially into the following year.   However, during the call, defendant Sheedy assured investors

6    that these problems would be resolved "soon" and the "impact will be behind" the Company.   In particular,

7    defendant Sheedy stated:

8    *We have made steady progress with our systems implementation work, though data integration efforts are taking longer than expected and are still impacting our business results. The largest remaining issues are related to warehouse product expiry data and store level reporting for IOs. We expect these to be resolved soon, after which the P&L impact will be behind. Charles will provide more details in his comments.*

11    *    *    *

12    We estimate the system transition impacted comp sales by approximately 200 basis points for the quarter. We opened 13 new stores during the quarter, including 7 in the East and 1 in Southern California, ending the year with 468 locations. We remain pleased with the performance of our new stores, which are ramping in line with our expectations.

16    Gross profit increased 6.3% to $298.9 million, representing a 30.2% gross margin rate, slightly better than our expectations. We continue to experience healthy deal flow, which helped offset the margin impact of our system integration which we estimate was approximately 130 basis points in the quarter.

19    *    *    *

20    Now let me provide you with some commentary on our fiscal 2024 guidance, which includes the impact of the United Grocery Outlet acquisition and the system transition ... *With respect to our system transition, while we have made progress, the data integration efforts have taken longer than anticipated. Because of this, we expect we'll continue to experience P&L impacts during the first quarter.*

23    With that as background, let me provide you with our expectations for fiscal 2024. For the full year, we are projecting comp sales growth in the range of 3% to 4%. *We expect comp growth in the first quarter to be approximately 2%, which includes an estimated 50-basis-point impact from the system transition.*

26    *    *    *

27    *We expect gross margin for the quarter of approximately 30.4%, which includes an estimated 100-basis-point impact from the system transition.*

- 12 -

45.     During the question-and-answer portion of the call, in response to an analyst's inquiry concerning the impact of the Company's Systems Transition on its fourth-quarter sales, defendant Bracher downplayed the severity of the transition's effect.  Defendant Bracher represented that the Company had the transition under control and that the business was "healthy and improving."  In particular, defendant Bracher stated:

> So let me start first in terms of overall comp for – again 2.7% for us in the quarter, a bit better than we guided. It was a combination of slightly higher **basket. So think about that as being the inventory recovery coming out -- working through the system implementation was a bit faster than we thought so that helped basket.** And supplementing that traffic was a little bit better. In terms of cadence throughout the quarter, we saw comps improve modestly as we progressed. More importantly, we're tracking very closely the prior year comparisons get a little bit noisy now. We're looking at average weekly sales into some nice improvement through the fourth quarter, that has continued into the first quarter. **So I feel like the underlying trends in the business are healthy and improving as we again work our way through the system transition.**

46.     On February 28, 2024, Grocery Outlet filed its Annual Report on Form 10-K for the fiscal year ended December 30, 2023 (the "2023 Form 10-K") with the SEC.  The 2023 Form 10-K, signed by defendants Lindberg, Ragatz, Alterman, Bachman, Haben, Herman, Jaros, Moody-Byrd, York, Sheedy, and Bracher, continued to understate the severity and duration of the disruptions stemming from the Company's Systems Transition.  The 2023 Form 10-K omitted the fact that the issues were ongoing and would extend well into the following year.  In particular, the 2023 Form 10-K stated:

> We modify, update and replace our systems and infrastructure from time to time, including by adding new hardware, software and applications; maintaining, updating or replacing legacy programs; converting to enhanced systems; integrating new service providers; and adding enhanced new functionality, such as cloud computing technologies. **In addition, we have a customized enterprise resource planning system, components of which have been replaced over the past several years, including our financial ledger, inventory management platform and product data warehouse system, which were replaced in late August 2023. As previously disclosed, the implementation of these system upgrades resulted in ordering and inventory disruptions, which impacted our results of operations during the remainder of fiscal 2023.** We also will continue to identify and implement productivity improvements through both operational initiatives and system enhancements, such as category assortment optimization, improved inventory management tools and greater purchasing specialization.

## **THE TRUTH BEGINS TO EMERGE**

47.    The truth behind Grocery Outlet's issues began to emerge on May 7, 2024, when the Company issued a press release announcing its financial results for the first quarter ended March 30, 2024. The press release revealed that the Systems Transition produced a greater-than-anticipated adverse impact on the Company's performance.  In particular, the press release stated:

> Gross margin decreased 180 basis points to 29.3%. As previously disclosed, the Company experienced disruptions as a result of the implementation of new technology platforms in late August 2023. Such disruptions are estimated to have negatively impacted gross margin by 210 basis points in the first quarter.

> Selling, general and administrative expenses increased by 13.3% to $303.4 million, or 29.3% of net sales. This includes $12.4 million of commission support we elected to provide our operators in connection with our system upgrades.

48.    That same day, Grocery Outlet held an earnings call with analysts and investors to discuss its financial results.  During the call, defendant Sheedy outlined the setbacks and reduced guidance, in pertinent part, as follows:

> Our low first quarter margins were the result of ***both expected and unexpected impacts from our systems transition.*** We've made good progress since our last call, resolving known issues and have ended the IO commission support program as planned. ***However, our results were incrementally impacted by unforeseen systems transition costs that surfaced at the end of the quarter. We are all very disappointed with our poor Q1 results, and we are committed to getting these system impacts behind us very soon.***
>
> *        *        *
>
> First quarter gross margin of 29.3% was ***110 basis points below our expectations and includes approximately 210 basis points of impact from our systems transition issues.*** In late August, we upgraded our product, inventory, financial and reporting platforms. ***This transition has disrupted our business operationally and financially over the past 8 months*** as we discussed on our last 2 calls. ***In February, there were 2 large remaining system issues impacting profit. One was related to warehouse product expiry data and the other related to store level reporting. We have since resolved both of these and the negative impact to first quarter gross margin came in as expected at about 100 basis points.***
>
> We've reduced warehouse shrink close to normal levels with better data visibility and accurate store-level reporting enabled us to end the commission support program in March. Lindsay will speak later about some residual expense from the commission support program that will extend through the end of the second quarter. ***While we are encouraged by this***

*progress, we are disappointed that we did not foresee the additional 110 basis points of margin impact. This was quantified during catch-up invoice processing and final margin reconciliation at the end of the quarter. Delayed payment processes during Q1, combined with poor data visibility, contributed to this miss versus guidance. We are disappointed by this as it is below our performance and forecasting standards.*

We have recently improved our payables process in the new system and have also increased our data visibility. Both of these improvements will enable us to manage the business back to historical margin levels and forecast with the same consistency as we did before.

\*    \*    \*

Now on to guidance. Forecasting has been difficult during the system transition as we have not had good visibility to our normal business reporting and tools. Compounding this have been data integration issues and new processes that we and our operators are adapting to within new applications. Our guidance takes us into consideration as we complete final stages of our stabilization work

Our fiscal 2024 guidance continues to assume incremental sales of approximately $125 million, adjusted EBITDA of $7 million and a modest benefit to adjusted EPS from the acquisition of UGO. For the full year, we are now projecting comp sales growth in the range of 3.5% to 4.5%, up from 3% to 4% to reflect better-than-expected first quarter sales. We expect comp growth in the second quarter to be approximately 3.2%, which reflects a 100 basis points Easter shift out of Q2 into Q1. We now expect to add a total of 58 to 62 net new stores this year, up from 55 to 60. This includes the 40 newly acquired United Grocery Outlet stores as well as 18 to 22 new Grocery Outlet stores. In total, we continue to project fiscal 2024 net sales of $4.3 billion to $4.35 billion.

For the full fiscal year, we now project gross margin of approximately 30.5%. *We expect gross margin for the second quarter of approximately 30.0%, which includes an estimated 100 basis point impact from the systems transition. This is due to residual expense from our commission support program as we finish store physical inventory counts in the second quarter.* We expect gross margins to increase sequentially in the back half of the year.

49.     On this news, Grocery Outlet's stock price fell over 19.3%, or $5.02 per share, on May 8, 2024, to close at $20.88 per share compared to the previous trading day's closing of $25.90 per share, erasing over $501.3 million in market capitalization in a single day.

50.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements made during the alleged false and/or materially misleading statements identified above.  In those statements, the Individual Defendants continually praised their efforts to upgrade and transition the Company's internal systems and touted the benefits of such new and upgraded systems, while continually minimizing the risks associated with potential and perceived issues

1  surrounding the implementation of its Systems Transition.

2      51.    A number of well-known analysts who had been following Grocery Outlet lowered their

3  price targets in response to Grocery Outlet's disclosures.  For example, Guggenheim cut estimates and

4  highlighted that "[t]he ERP-related operational/financial disruption, which has dominated the narrative

5  over the past six months, reached a crescendo with the largest 'miss and guide-down' to date driving the

6  shares ~15% lower after-hours."  Speaking to Grocery Outlet's overall performance for the quarter and

7  disappointing second quarter guide, the analyst stated:

8          However, adjusted EBITDA missed by $14 million with margin declining
        a greater-than- we-modeled 270 basis points. Reported gross margin eroded
9          by 182 basis points, *a shortfall of more than 100 basis points which was
        attributed to a lack of visibility into margin dynamics. GO's unique,
10         treasure hunt-oriented procurement model requires informed buying and
        pricing decisions and this was lacking, in our view.*

11                              *       *       *

12         The 2Q guide was even more surprising *since we assumed that the
        transitory costs were behind us.* Instead, as detailed in Exhibit 4,
13         management guided to gross and EBITDA margins of 30.0% and 5.4%,
        respectively, *150-200 basis points below our estimates.*
14

15     52.    Additionally, Telsey Advisory Group, while cutting their price target, summarized the

16  issues surrounding the Systems Transition in detail, stating:

17         In August 2023, Grocery Outlet started to upgrade its inventory, financial,
        and reporting systems, but the implementation has taken longer to execute,
18         creating product and data visibility issues as well as operating challenges.
        In February 2024, the company finally completed the upgrade of its last two
19         remaining systems—warehouse product expiry data and store level
        reporting. However, execution challenges, physical inventory counting, and
20         invoicing issues caused pressure on the gross margin. Furthermore, Grocery
        Outlet provided commission support to its independent operators (IOs)
21         during this disruption, which further elevated expenses. Overall, the system
        transition issue created profit pressure of ~$65MM over the past year, with
22         half of it being IO commission support[.]

23     53.    Similarly, Jefferies, while also cutting their price target, highlighted the impact resulting

24  from Systems Transition in the current quarter as follows:

25         GM came in at ~29.3%, below cons of ~30.4%, due to the new systems
        integration headwinds. The co. estimated the systems disruption equated to
26         a ~210bps drag on GM in Ql, or ~1lObps higher than mgmt's expectations.
        Looking ahead, GO expects the disruption to continue through Q2;
27         however, noted that critical reporting and visibility functions have been
        restored, and anticipate a reversion to a more normalized margin level in
28         2H.

54.     The full extent of the truth remained unknown to the market, as the Company continued to downplay technological issues associated with the Systems Transition.  On August 6, 2024, Grocery Outlet held an earnings call with analysts and investors for the second quarter ended June 29, 2024.  During the call, defendant Sheedy stated:

> We made good progress with our systems transition work over the past three months and the material P&L impact from this is now behind us. We are executing new store openings very well and ahead of schedule.
>
> *           *           *
>
> We continue to make good progress with ongoing systems transition work. Our effort is currently focused on improving visibility to additional operating data, increasing system speed, enhancing functionality and optimizing the system for efficiencies.
>
> While these enhancements will improve aspects of our new systems that are still challenging to employees and operators, none of what remains should have a negative material impact to our future financial results.

55.     The statements referenced above were false and/or materially misleading.  Grocery Outlet's fiduciaries created the false impression that they possessed reliable information regarding the completion of the Systems Transition and its potential negative impacts, while downplaying risks associated with implementation setbacks.  In reality, their projections about the timeline and financial impact were overly optimistic, as Grocery Outlet was inadequately prepared to execute the transition without significant financial disruptions, despite repeated assurances to investors that these issues would be resolved and the transition completed with each coming quarter.

## THE TRUTH FULLY EMERGES

56.     On October 30, 2024, the truth fully emerged when Grocery Outlet filed a Current Report on Form 8-K with the SEC, announcing that defendant Sheedy agreed to step down from his role at the Company.  In particular, the Current Report stated:

> After discussion with the Board of Directors of the Company (the "Board"), on October 29, 2024, Robert J. Sheedy, Jr. agreed to step down as the Company's President and Chief Executive Officer and resign as a member of the Board, effective immediately. Mr. Sheedy's decision to resign as a director was not due to any disagreement with the Company's operations, policies or practices. Mr. Sheedy will receive separation benefits of a termination without cause as set forth in the employment agreement with the Company he entered into on November 2, 2022, subject to execution

and non-revocation of a general release of claims in favor of the Company, and the award agreements governing his outstanding equity awards.

57.    On this news, the price of Grocery Outlet common stock price fell 16.3%, or $2.71 per share, on October 30, 2024, to close at $13.90 per share compared to the previous trading day's closing of $16.61 per share, erasing over $263.2 million in market capitalization in a single day.

58.    On November 5, 2024, Grocery Outlet held an earnings call with analysts and investors to discuss its financial results for the third quarter ended September 30, 2024.  During the call, Grocery Outlet confirmed that defendant Sheedy had been asked to resign due to material issues with the systems upgrade.  In particular, during the call, the following exchange occurred between an analyst and defendant Lindberg, the Interim CEO and Chairman of the Board, who confirmed that defendant Sheedy had essentially been terminated as a result of the issues discussed herein:

> **Analyst:** [...] My question is, I was hoping we could just get more color on RJ's departure and also what type of CEO you're looking to replace him with. And maybe related to that, just to clarify the systems, where is the system's disruption right now? Is it is it behind you or is there still risk to the first half of next year related to that?
>
> **Defendant Lindberg:** Yeah. Hey Robbie. Good to talk to you again. Thanks for the question. So let me start first with the CEO transition. ***You all know, this last year has been really difficult it's been an operational challenge year from the systems transition.*** We have not executed like we want like our expectations and like our history. And that's been super challenging.
>
> I'd say because of the relationship that we've all enjoyed, working with RJ for many, many years, we were patient. We felt like that was the right thing to do to be patient. And but I can tell you the same way that you all might be feeling about our performance we were feeling that internally as well. ***So, we finally got to a point after the last Board Meeting where, we sat down.***
>
> ***We had a frank conversation and we had an agreement to move forward.*** So, I really want to make sure everyone knows that, we didn't have any major disagreement. There's no new finding that you guys have learned about later there is no shoot or drop.
>
> This is just a little bit of inconvenient timing. And sort of a function of how things played out nothing more. The question on systems kind of where are we today? I'll repeat a little bit of what I've said. I'm still digging into it, still getting up to speed. Let me say this the system is fully functional. We're still working on enhancements.
>
> ***We're still working on efficiency which are words that just say it's not quite working to the speed that we expect. I would say full stabilization has been a bigger undertaking than we originally anticipated internally that just translates, it's been more resources, it's taken more time.***

But I would say that we're making a lot of progress. I'll give you a couple of examples of things that I'm looking for that may address sort of your timing. The biggest thing to be is for the operators, is having their real-time order guide and their new arrival order guide back.

There it sounds like tactical things. But as a merchant being able to order off of our system and be able to look at a live inventory be able to tap into the system and pick what you want in your store, that's kind of nirvana in a in an opportunistic model.

And so, we have not had that tool. It's not back yet and we get that back I think we've sort of rounded towards home and the system will be finished. It's working, the tool is working, but it's not doing for us what we need it to do completely. So, really look forward to getting it, again as I said sort of in the rear-view mirror.

59.    Defendant Lindberg further stated the following about various issues with the Systems Transition:

Let me start with where we are today. First on systems. In August of 2023, we transitioned to SAP from our legacy systems and experienced significant issues, including poor data visibility, slow system speeds, and a loss of tools and functionality. These issues hurt our buyers' ability to write purchase orders efficiently, our inventory planning and supply chain teams' ability to accurately manage inventory and our operators' ability to see real time inventory in their order guide to bring product into their stores. The impact in the business has been significant. And we have made substantial progress over the last year including ending operator commission support.

While the new system is fully functional, work remains to improve visibility into additional operating data to increase speed and to refine the tools that we and our operators use to manage the business. This work is critical to executing our dynamic business effectively.

**THE CURRENT DIRECTOR DEFENDANTS CAUSED GROCERY OUTLET TO REPURCHASE ITS OWN STOCK AT ARTIFICIALLY INFLATED PRICES**

60.    Despite their knowledge, or reckless disregard for, the Company's growth prospects, the Current Director Defendants approved substantial stock repurchases at artificially inflated prices. While the price of Grocery Outlet's stock was inflated due to the false and misleading statements made by the Individual Defendants, the Current Director Defendants caused Grocery Outlet to repurchase 4,108,817 shares of its own common stock for a total of $83,976,921.40.

61.    In November 2021, the Board approved a share repurchase program (the "2021 Share Repurchase Program"). This program, effective November 5, 2021 and without an expiration date, authorized the Company to repurchase up to $100 million of its outstanding common stock utilizing a

variety of methods including open market purchases, accelerated share repurchase programs, privately negotiated transactions, structured repurchase transactions and under a Rule 10b5-1 plan (which would permit shares to be repurchased when the Company might otherwise be precluded from doing so under securities laws).

62.    By the end of 2023, approximately $89.8 million worth of Company common stock was authorized for repurchases by the Company.  From November 2021 to September 2023, the Company repurchased only over $6.7 million worth of Company common stock, amounting to over 6.7% of shares repurchased under the 2021 Share Repurchase Program.  Within just a year, from October 2023 to October 2024, the Company repurchased almost $84 million worth of Company common stock amounting to almost 84% of shares repurchased the 2021 Share Repurchase Program.

63.    In November 2024, the Board approved a new share repurchase program (the "2024 Share Repurchase Program"), which replaced the 2021 Share Repurchase Program, under which $9.4 million previously remained available for repurchase.  The 2024 Share Repurchase Program, effective November 1, 2024, and without an expiration date, authorized the Company to repurchase up to $100 million of its outstanding common stock (inclusive of fees and commissions) utilizing a variety of methods, including open-market purchases, accelerated equity repurchase programs, privately negotiated transactions, block trades and transactions under a Rule 10b5-1 plan.

64.    On February 28, 2024, Grocery Outlet filed the 2023 Form 10-K for the fiscal year ended December 30, 2023, with the SEC.  According to the 2023 Form 10-K, the Company completed stock repurchases in October 2023, November 2023, and December 2023.  During the period, Grocery Outlet purchased 131,654 shares of common stock for $3,533,593.36, at an average price of $26.84 per share.

65.    On May 8, 2024, Grocery Outlet filed its Quarterly Report on Form 10-Q for the fiscal quarter ended March 30, 2024, with the SEC.  According to the Form 10-Q, the Company completed a stock repurchase in March 2024.  During the period, Grocery Outlet repurchased 200,803 shares of its common stock for $5,325,295.56, at an average price of $26.52 per share.

66.    On August 7, 2024, Grocery Outlet filed its Quarterly Report on Form 10-Q for the fiscal quarter ended June 29, 2024, with the SEC.  According to the Form 10-Q, the Company completed stock repurchases in April 2024 and May 2024.  During the period, Grocery Outlet repurchased 1,104,726 shares

of its common stock for $25,033,091.20, at an average price of $22.66 per share.

67.     On November 6, 2024, Grocery Outlet filed its Quarterly Report on Form 10-Q for the fiscal quarter ended September 28, 2024, with the SEC.  According to the Form 10-Q, the Company completed a stock repurchase in July 2024.  During the period, Grocery Outlet repurchased 1,164,423 shares of its common stock for $25,035,094.50 at an average price of $21.50 per share.

68.     On February 26, 2025, Grocery Outlet filed its Annual Report on Form 10-K for the fiscal year ended December 28, 2024, with the SEC.  According to the Form 10-K, the Company completed a stock repurchase in October 2024, with the SEC.  During the period, Grocery Outlet repurchased 1,507,211 shares of its common stock for $25,049,846.80 at an average price of $16.62 per share.

69.     However, the Company's stock was worth only $13.90 per share, the trading price at market close on October 30, 2024, after the truth emerged.  The Individual Defendants and the Current Director Defendants caused Grocery Outlet to repurchase 4,108,817 shares of its own common stock for a total of $83,976,921.40, even though the true value of those shares was $57,112,556.30.  In sum, Grocery Outlet overpaid by $26,864,365.10 for repurchases of its own common stock at artificially inflated prices.

## SALES BY THE INSIDER SELLING DEFENDANTS

70.     Rather than providing the market with accurate information, the Insider Selling Defendants used their knowledge of Grocery Outlet's material nonpublic information to sell their personal holdings while the Company's stock was artificially inflated.  As directors of Grocery Outlet, defendants Lindberg and Herman were privy to material nonpublic information about the Company's true business prospects.

71.     While in possession of this knowledge, defendant Lindberg sold 1,510,179 shares of his personally held Grocery Outlet stock for proceeds of over $38.7 million before the truth emerged.  Defendant Lindberg's sales were timed to maximize profit from Grocery Outlet's then artificially inflated stock price.

72.     While in possession of this knowledge, defendant Herman sold 13,000 shares of his personally held Grocery Outlet stock for proceeds of $385,700.  Defendant Herman's sales were timed to maximize profit from Grocery Outlet's then artificially inflated stock price.

73.     Collectively, the Insider Selling Defendants sold over $39.1 million worth of stock at artificially inflated prices as detailed in the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **LINDBERG** Director | 8/10/2023 | 246,449 | $34.69 | $8,549,315.81 |
| | 8/11/2023 | 255,951 | $34.35 | $8,791,916.85 |
| | 3/1/2024 | 100,000 | $26.01 | $2,601,000.00 |
| | 3/1/2024 | 100,000 | $26.21 | $2,621,000.00 |
| | 3/1/2024 | 100,000 | $26.27 | $2,627,000.00 |
| | 3/11/2024 | 43,684 | $26.45 | $1,155,441.80 |
| | 3/12/2024 | 64,000 | $26.75 | $1,712,000.00 |
| | 8/16/2024 | 100,000 | $18.90 | $1,890,000.00 |
| | 8/19/2024 | 100,000 | $18.83 | $1,883,000.00 |
| | 8/20/2024 | 100,000 | $18.62 | $1,862,000.00 |
| | 8/21/2024 | 100,000 | $18.44 | $1,844,000.00 |
| | 9/19/2024 | 200,095 | $16.29 | $3,259,547.55 |
| | **Total:** | **1,510,179** | | **$38,796,222.01** |
| **HERMAN** Director | 8/15/2023 | 2,000 | $33.09 | $66,180.00 |
| | 9/15/2023 | 2,000 | $30.07 | $60,140.00 |
| | 10/16/2023 | 2,000 | $27.69 | $55,380.00 |
| | 11/15/2023 | 2,000 | $29.74 | $59,480.00 |
| | 12/15/2023 | 2,000 | $28.76 | $57,520.00 |
| | 2/28/2024 | 2,000 | $29.00 | $58,000.00 |
| | 3/27/2024 | 1,000 | $29.00 | $29,000.00 |
| | **Total:** | **13,000** | | **$385,700.00** |
| | | | | |
| | **Total:** | **1,523,179** | | **$39,181,922.01** |

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

74. By virtue of their positions as officers, directors, and fiduciaries of Grocery Outlet and because of their ability to control the business and corporate affairs of Grocery Outlet, each of the Individual Defendants owed and owe Grocery Outlet and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were, and are, required to use their utmost ability to control and manage Grocery Outlet and in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Grocery Outlet and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each officer and director of the Company owes to Grocery Outlet and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

75.     The Individual Defendants, because of their positions of control and authority as officers or directors of Grocery Outlet, were able to, and did, directly and indirectly exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions within Grocery Outlet, each of the Individual Defendants had knowledge of material nonpublic information regarding the Company.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

76.     To discharge their duties, the officers and directors of Grocery Outlet were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Grocery Outlet were required to, among other things:

(a)     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner to make it possible to provide the highest quality performance of their business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(b)     exercise good faith to ensure that the Company operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

(c)     when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

77.     The Company's Corporate Governance Guidelines further state that the primary functions of the Board, among other things, require the Board to "oversee[] the management of the business and affairs of the Company in a manner consistent with the best interests of the Company and its stockholders." The Board also "serves as the ultimate decision-making body of the Company, except for those matters reserved for or shared with the stockholders." The Company's Code of Business Conduct and Ethics,

which expressly applies to defendants named herein, further states that: "We must maintain an attitude within the Company that unethical actions or the appearance of unethical actions are not acceptable, even though they may seem to be standard business practices in other companies. You must engage in and promote honest and ethical conduct."

78.     The Individual Defendants, because of their advisory, executive, managerial, and directorial positions of control and authority, were able to and did, directly or indirectly, exercise commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took part in, or substantially, assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and in furtherance of the wrongdoing.

79.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Grocery Outlet and at all times acted within the course and scope of such agency.

**Additional Duties of the Audit Committee Defendants**

80.     In addition to the above duties, and under the Audit Charter, which has been in effect since April 24, 2024, the Audit Committee Defendants owed specific duties to Grocery Outlet to assist the Board in overseeing the Company's compliance with legal and regulatory requirements. Moreover, the Audit Charter provides that the Audit Committee Defendants are required to assist in risk management by "[r]eview[ing] the annual enterprise risk management assessment ... with management, [and] the leader of the internal audit function[.] [S]uch review shall include oversight of the framework, quality and effectiveness of the enterprise risk management process, the Company's policies for monitoring, assessment, prioritization and management of risks, and the steps management has taken to monitor and mitigate such risks." Further, the Audit Committee Defendants were required to assist the Board in its oversight of:

(i)     The quality and integrity of the Company's financial statements, including the oversight of the Company's accounting and financial reporting processes;

(ii)    The Company's compliance with legal and regulatory requirements related to financial reporting and internal controls;

(iii)    The independent registered public accounting firm's retention, fees, qualifications, planned audit procedures, performance and independence;

(iv)    The Company's corporate compliance program, including the Company's Code of Business Conduct and Ethics, and investigating or overseeing investigations of possible violations thereunder;

(v)    The risk management policies and procedures of the Company; and

(vi)    The performance of the Company's internal audit function.

The Committee's responsibility is one of oversight. The Company's management is responsible for the Company's internal control over financial reporting and disclosure controls and procedures, the preparation and the integrity of the Company's financial statements and related notes, and accounting and financial reporting principles.

\*     \*     \*

Prepare the Committee report required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

81.    The Audit Charter also lists the following responsibilities of the Audit and Risk Committee:

(a) Review and discuss with management and the independent registered public accounting firm, prior to public dissemination, the Company's annual audited financial statements and quarterly unaudited financial statements and related notes, the reports of the independent registered public accounting firm on the annual audited financial statements and internal control over financial reporting, and the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in the Company's SEC filings.

\*     \*     \*

3) Review and discuss with management and, if appropriate, the independent registered public accounting firm the Company's earnings press releases (including non-GAAP financial measures), as well as financial information and earnings guidance provided to stockholders, analysts and rating agencies. The Committee's discussion in this regard may be general in nature (i.e., discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the Company may provide financial information and earnings guidance.

4) Review and discuss with management and the independent registered public accounting firm any significant issues (including any significant deficiencies or material weaknesses) arising as to the adequacy or effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures (including management's reports thereon), any actions taken in light of material control deficiencies and the adequacy of disclosures about changes in internal control over

financial reporting.

\*      \*      \*

15) Review the appointment and replacement (if applicable) of the leader of the internal audit function.

16) Review the significant reports to management prepared by the internal audit function and management's responses.

17) Review and discuss the responsibilities, annual work plan and planned audit procedures, performance, budget and staffing of the Company's internal SOX audit function with the internal audit function, and, if appropriate, with the independent registered public accounting firm and/or any third party service provider providing internal SOX audit services to the Company. Discuss the annual work plan, planned audit procedures and testing results privately with internal audit, without management present, including to make inquiries regarding the independence of the SOX testing scope and findings.

18) Periodically, review and discuss with the Company's counsel any legal matter that could have a significant impact on the Company's financial statements, including any contingent liabilities related to such proceedings, or internal controls.

19) Review and discuss with management the Company's corporate compliance program, including its Code of Business Conduct and Ethics and any procedures for monitoring compliance with the program, as well as any material inquiries received from regulators or government agencies.

20) Investigate or oversee the investigation undertaken by or on behalf of the Company regarding the possible violations of the Company's corporate compliance program and report the results and recommendations to the Board of Directors.

\*      \*      \*

24) Establish procedures for: (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

25) Oversee, review and periodically update the Company's Code of Business Conduct and Ethics (including review of requests of waivers thereof by executive officers and directors) and oversee the Company's system to monitor compliance with and enforce such Code of Business Conduct and Ethics.

\*      \*      \*

28) Based on discussions with the independent registered public accounting firm and management, determine whether to recommend to the Board of Directors that the audited financial statements be included in the Company's Annual Report on Form 10-K for the last completed fiscal

year for filing with the SEC.

29) Prepare the Committee report required by the SEC to be included in the Company's annual proxy statement, which shall disclose, among other things, its prior recommendation to the Board of Directors whether the audited financial statements should be included in the Company's Annual Report on Form 10-K for the last completed fiscal year for filing with the SEC.

30) Report regularly to the Board of Directors including:

    i.    with respect to any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements impacting the financial statements or internal controls, the qualification, performance and independence of the Company's independent registered public accounting firm or the performance of the internal audit function;

    ii.    periodically following meetings of the Committee; and

    iii.    with respect to such other matters as are relevant to the Committee's discharge of its responsibilities.

82.    While the Audit and Risk Committee had clear responsibilities with respect to ensuring that there were controls regarding the accuracy of the Company's financial disclosures and the Company's communication with the public, it failed to fulfill these responsibilities.  In fact, the Audit Committee Defendants have gravely harmed the Company by taking part in the publishing of false and misleading statements and/or omissions of material fact described herein.

## **BREACHES OF DUTIES**

83.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Grocery Outlet, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

84.    The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to engage in making materially false and misleading statements, improper practices that wasted the Company's assets, and caused Grocery Outlet to incur substantial damage.

85.     Moreover, the Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings.  The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Grocery Outlet's public statements and internal control functions.

86.     The Individual Defendants, because of their positions of control and authority as officers or directors of Grocery Outlet, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Grocery Outlet has expended, and will continue to expend, significant sums of money.

## DAMAGES TO GROCERY OUTLET

87.     As a result of the Individual Defendants' actions, Grocery Outlet disseminated improper, public statements concerning the Company's inability to successfully execute its Systems Transition. From the time the Individual Defendants made their improper statements until the truth emerged, their actions severely damaged Grocery Outlet's credibility, resulting in a total market capitalization loss of nearly $2 billion, or 60.4%.

88.     Grocery Outlet's issues also damaged its reputation within the business community and in the capital markets.  In addition to price, the Company's current and potential customers consider its ability to accurately value its business prospects and evaluate growth potential.  Investors are less likely to invest in companies that are uncertain about their own financial conditions and fail to disclose material information in a timely manner.  Additionally, Grocery Outlet's ability to raise equity capital or debt on favorable terms in the future is now impaired.  Furthermore, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

89.     Further, as a direct and proximate result of the Individual Defendants' improprieties, Grocery Outlet has expended, and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred in repurchasing its own stock at inflated prices;

(b)    costs incurred from defending and paying any adverse settlements or judgments in the pending Securities Class Actions; and

(c)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Grocery Outlet.

90.    In addition, the Insider Selling Defendants utilized the Company's assets, its material nonpublic information, to benefit themselves.   Accordingly, the Insider Selling Defendants must disgorge any benefit they received from utilizing this information back to Grocery Outlet.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

91.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

92.    Plaintiff brings this action derivatively in the right, and for the benefit of Grocery Outlet, to redress the violations of securities law, breaches of fiduciary duty, and unjust enrichment, by the Individual Defendants.  Grocery Outlet is named as a nominal defendant solely in a derivative capacity.

93.    Plaintiff will adequately and fairly represent the interests of Grocery Outlet and its stockholders in enforcing and prosecuting its rights.

94.    Plaintiff was a stockholder of Grocery Outlet at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Grocery Outlet stockholder.

95.    The Board currently consists of the following ten directors: Defendants Lindberg, Ragatz, Potter, Alterman, Bachman, Haben, Herman, Jaros, Moody-Byrd, and York (the "Demand Board"). Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons that follow.

96.    The Demand Board served as directors of the Company during at least a substantial part of the wrongdoing alleged herein, and each faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

**Demand Is Excused Because the Demand Board Faces a Substantial Likelihood of Liability for Making or Causing the Company to Make Materially False and Misleading Statements**

97.    Defendants Lindberg, Ragatz, Potter, Alterman, Bachman, Haben, Herman, Jaros, Moody-Byrd, and York, consisting of the entire Board, served as directors of the Company during at least a

substantial part of the wrongdoing alleged herein, and each faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.  The actions these defendants repeatedly and continuously caused or allowed to occur, particularly concern (among other things) material issues around the Systems Transition's completion and downplaying the risks associated with the Systems Transition setbacks.  In reality, their projections about the timeline and financial impact were overly optimistic, as Grocery Outlet was inadequately prepared to execute the transition without significant financial disruptions, despite repeated assurances to investors.  Accordingly, the Demand Board faces a substantial likelihood of liability for making materially false and misleading statements.

98.    Additionally, defendants Lindberg, Ragatz, Potter, Alterman, Bachman, Haben, Herman, Jaros, Moody-Byrd, and York caused or approved the Company's repurchases totaling over $83.9 million of its stock at artificially inflated prices.  Thus, the Current Director Defendants face a substantial likelihood of liability for their breaches of fiduciary duties and violations of securities law.

99.    During the relevant period, defendants Bachman, Herman, Moody-Byrd, and York served as members of the Audit and Risk Committee.  Pursuant to the Audit Charter, the members were, and are, responsible for, *inter alia*, reviewing the integrity of the Company's internal controls, reviewing legal and regulatory matters that may have a material impact on the financial statements, and discussing with management the corporation's programs to monitor compliance with laws, regulations, and internal policies and standards.  The Audit Committee Defendants breached their fiduciary duties of due care, loyalty, and good faith, because the Audit and Risk Committee, *inter alia*, allowed or permitted the Company to issue false and misleading statements regarding the Company's Systems Transition's completion and risks associated with setbacks of the Systems Transition.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of candor and duty of loyalty because they participated in the wrongdoing described herein.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

**Demand Is Further Excused Because Defendants Lindberg, Potter, and Herman Are Not Independent**

100.    Demand is further excused as to Defendant Lindberg.  Defendant Lindberg has served as a director since January 2006, and as its Chairman since January 2023.  He is also the former CEO of

Grocery Outlet and served as a director at all relevant times. Moreover, defendant Lindberg holds 2.8% voting power of the Company. As stated above, Grocery Outlet provides defendant Lindberg with significant compensation for his role within the Company. Further, as a trusted director, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarding his duties to protect corporate assets. As a result, defendant Lindberg would be disinterested in a demand regarding his own wrongdoing, and demand upon him would be futile.

101. Demand is also further excused as to defendant Lindberg because he received a material personal benefit from insider trading on the basis of material nonpublic information, as described herein, and was unjustly enriched thereby. Specifically, defendant Lindberg reaped over $38.7 million from insider sales. Moreover, defendant Lindberg faces a substantial likelihood of liability because he engaged in this insider trading with scienter.

102. Demand is excused as to defendant Potter. Defendant Potter has served as the Company's President, CEO, and as a director. Thus, he is not independent under the NASDAQ listing rules. As an employee of the Company, defendant Potter derives substantially all of his income from his employment with Grocery Outlet. Accordingly, defendant Potter could not disinterestedly consider a demand for action that might require him to sue the directors who control his continued employment and/or his fellow members of management with whom he works on a day-to-day basis.

103. Additionally, as Grocery Outlet's highest-ranking officer, defendant Potter conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme and consciously disregarded his duties to protect corporate assets. As a result, he breached his fiduciary duties, faces a substantial likelihood of liability, and lacks independence. Thus, demand upon defendant Potter is futile.

104. Demand is excused as to defendant Herman. Defendant Herman has served as a director since 2004. As a trusted director, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarding his duties to protect corporate assets. As a result, defendant Lindberg would be disinterested in a demand regarding his own wrongdoing, and demand upon him would be futile.

105.     Demand is also further excused as to defendant Herman because he received a material personal benefit from insider trading on the basis of material nonpublic information, as described herein, and was unjustly enriched thereby.  Specifically, defendant Herman reaped approximately $385,700 from insider sales.  Moreover, defendant Herman faces a substantial likelihood of liability because he engaged in this insider trading with scienter.

<u>**COUNT I**</u>

**Against the Individual Defendants for Violations of Section 10(b) of
the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder**

106.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.     During the period of wrongdoing, the Individual Defendants disseminated or approved false or misleading statements about Grocery Outlet, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and defendants' course of conduct artificially inflated the price of the Company's common stock.

108.     While the price of the Company's common stock was inflated due to the false and misleading statements made by the Individual Defendants, the Current Director Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices.  The Current Director Defendants engaged in a scheme to defraud Grocery Outlet by causing the Company to repurchase $83,976,921.40 in shares of its own stock at artificially inflated prices.

109.     The Individual Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Grocery Outlet in connection with the Company's repurchases of its own stock during the period of wrongdoing.

110.     The Individual Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various

false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices, and artifices to defraud in connection with the purchase and sale of Grocery Outlet stock, which were intended to, and did: (a) deceive Grocery Outlet and its stockholders regarding, among other things, the Company's growth and business prospects; (b) artificially inflate and maintain the market price of Grocery Outlet's stock; and (c) cause Grocery Outlet to repurchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known.  Throughout the period of wrongdoing, the defendants were in possession of material nonpublic information regarding the above.

111.    The Individual Defendants were among the senior management and directors of the Company, and were therefore directly responsible for, and are liable for, all improper statements made during the period of wrongdoing, as stated above.

112.    The Individual Defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misstatements and omissions of material facts set forth in this Complaint were either known to the Individual Defendants or were so obvious that the defendants should have been aware of them.  Throughout the period of wrongdoing, the defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

113.    The Individual Defendants' false or misleading statements and omissions were made in connection with the repurchases of Grocery Outlet stock by the Company.

114.    As a result of the Individual Defendants' misconduct, Grocery Outlet has and will suffer damages because it paid artificially inflated prices for its own common stock and suffered losses when the previously undisclosed facts relating to the wrongdoing was disclosed.

115.    Grocery Outlet would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Individual Defendants' false or misleading statements.

116.    As a direct and proximate result of the Individual Defendants' wrongful conduct, the Company suffered damages in connection with the repurchases of Grocery Outlet stock during the period

of wrongdoing.  By reason of such conduct, the Individual Defendants are liable to the Company pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

<u>**COUNT II**</u>

**Against the Individual Defendants**
**for Violations of Section 20(a) of the Exchange Act**

117.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118.    The Individual Defendants, by virtue of their positions with Grocery Outlet and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Grocery Outlet and officers and directors who made the false and misleading statements alleged herein within the meaning of section 20(a) of the Exchange Act.  The Individual Defendants had the power and influence—and exercised that power—to cause Grocery Outlet to engage in the unlawful conduct and practices complained of herein.

119.    Plaintiff, on behalf of Grocery Outlet, has no adequate remedy at law.

<u>**COUNT III**</u>

**Against the Individual Defendants for Breach of Fiduciary Duties**

120.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.    The Individual Defendants owed and owe Grocery Outlet fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owes Grocery Outlet the highest obligation of loyalty and care.

122.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry, causing the Company to engage in the misconduct described herein.

123.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain

and disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly, recklessly, and for the purpose and effect of artificially inflating the price of the Company's securities.

124.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact described herein, rendering them personally liable to the Company for breaching their fiduciary duties.

125.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its publicly reported financials.  These actions could not have been a good-faith exercise of prudent business judgment to protect and promote the Company's corporate assets.

126.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein, which were made during their tenure on the Audit and Risk Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight and failed in their duty to appropriately review financial results, as required by the Audit Charter in effect at the time.

127.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Grocery Outlet has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

128.    Plaintiff, on behalf of Grocery Outlet, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Grocery Outlet in the form of salaries, bonuses, and other forms of compensation.

131.    Plaintiff, as a stockholder and representative of Grocery Outlet, seeks restitution from the Individual Defendants, and each of them, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

132.    Plaintiff, on behalf of Grocery Outlet, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of Grocery Outlet, demands judgment as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Grocery Outlet, and that Plaintiff is an adequate representative of the Company;

B.    Finding that any demand upon the Board concerning the wrongdoing complained of herein would be futile;

C.    Against the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' violations of securities law, breaches of fiduciary duties, and unjust enrichment;

D.    Directing Grocery Outlet to take all necessary actions to reform and improve its corporate governance and internal procedures to ensure the Company's compliance with applicable laws and regulations and to protect the Company and its stockholders from a repeat of the damaging events described herein;

E.    Equitable and injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to ensure that Plaintiff, on behalf of Grocery Outlet, has an effective remedy;

F.    Awarding to Grocery Outlet restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: May 2, 2025

ROBBINS LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
SHANE P. SANDERS

/s/Brian J. Robbins
BRIAN J. ROBBINS

5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile (619) 525-3991
E-mail: brobbins@robbinsllp.com
        csmith@robbinsllp.com
        ssanders@robbinsllp.com

LEVI & KORSINSKY, LLP
Gregory M. Nespole
Daniel Tepper
Correy A. Suk
Sidharth Kakkar
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
E-mail: gnespole@zlk.com
        dtepper@zlk.com
        ckamin@zlk.com
        skakkar@zlk.com

Attorneys for Plaintiff

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## **VERIFICATION**

I, TIMOTHY JACKSON, declare that I have reviewed the Verified Stockholder Derivative Complaint For Violation of Securities Law, Breach of Fiduciary Duty, and Unjust Enrichment ("Complaint") prepared on behalf of GROCERY OUTLET HOLDING CORP. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason, believe them to be true. I further declare that I am a current holder, and have been a holder, of GROCERY OUTLET HOLDING CORP. common stock at all relevant times.

Date May ²_____, 2025

_Timothy Jackson_
Timothy Jackson (May 2, 2025 11:51 EDT)
_____

Timothy Jackson